**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Deral Gene HOLMAN, Donald Bruce Holman, John Mallory Obert, Defendants-Appellants.**

No. 80–5954.

United States Court of Appeals, Eleventh Circuit.

July 22, 1982.

Rehearing and Rehearing En Banc Denied Oct. 19, 1982.

See also, 510 F.Supp. 1175.

James K. Jenkins, Atlanta, Ga., for Donald Holman and John O'Bert.

Michael T. Simpson, Asst. U. S. Atty., Tallahassee, Fla., for plaintiff-appellee.

Before GODBOLD, Chief Judge, and SIMPSON and FAY, Circuit Judges.

FAY, Circuit Judge:

In August of 1980, Deral Gene Holman and his three sons, Deral Keith Holman, Donald Bruce Holman and Michael Holman, together with a family acquaintance, John Mallory ["Johnny"] Obert, were indicted for conspiring to possess marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 846, and for possessing with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Prior to trial, the government dismissed charges against Michael Holman. His brother, Deral Keith, obtained immunity from prosecution in exchange for his testimony as chief government witness. Following trial, verdicts of guilty were returned as to the remaining defendants.

Deral Gene Holman, Donald Bruce Holman and John Mallory Obert presently appeal from their convictions on eight distinct evidentiary and constitutional grounds. After fully reviewing their objections, we hereby reject each.

## I. FISHY BUSINESS

Deral Gene Holman owns the Holman Seafood Company, a fishing concern in Southport, Bay County, Florida. The company's operations consist of catching fish aboard Holman's commercial snapper boat, the Red Fin II, unloading them at company-owned docks and processing them at the Holman Seafood House. Deral Gene's three sons, Deral Keith, Donald Bruce and Michael, are employees of the company. Together with Johnny Obert, they assist as fishermen on the Red Fin II.

Around midnight one evening in July, 1979, Johnny Obert, Donald Bruce and Deral Keith steered the Red Fin II to a spot in the Gulf of Mexico, approximately 150 miles south of Pensacola. There, the Red Fin II met a one-hundred foot Colombian boat and proceeded to load from it bales of marijuana wrapped in burlap bags. Together with its crew, the Red Fin II immediately returned to the Holman Seafood House. La-

ter that same night, trucks arrived at the House. Donald Bruce, Deral Keith and Johnny Obert loaded the bales of marijuana onto the vehicles; Deral Keith retained several bales for subsequent sale. His father, Deral Gene, was present intermittently during the entire unloading period. After the trucks departed, Deral Keith, Donald Bruce and Johnny Obert cleaned up the residue of marijuana.

One week later, Deral Keith obtained approximately $60,000.00 from his father, as payment for his services in the drug transaction; Donald Bruce and Johnny Obert each received in the neighborhood of $25,-000.00, together with a bale of marijuana. For his part, Deral Gene was paid more than $60,000.00.

A federal grand jury indicted Deral Gene, Deral Keith, Donald Bruce, as well as Johnny Obert, for committing drug offenses in connection with the July '79 transaction. In order to obtain immunity from prosecution, Deral Keith agreed to testify on behalf of the government. After a polygraph examination revealed that his accusations implicating his brother, Michael, were false, allegations in the indictment against Michael were dismissed. Deral Keith went on to testify at trial against his father, Donald Bruce and Johnny Obert, following which all pending charges against Deral Keith were likewise dismissed.

Throughout the trial, Johnny Obert and Donald Bruce Holman denied any participation whatsoever in the illicit scheme. Deral Gene admitted granting Keith permission to use the Red Fin II for the operation; he maintained, however, that his consent was involuntarily obtained. Insisting that he had refused at first to go along with the scheme proposed by Deral Keith, he stated that it was not until his son informed him that he, Deral Keith, had been threatened with machine guns, that Deral Gene finally acquiesced.

The jury rejected these defenses and found the defendants guilty as charged. Deral Gene Holman was sentenced to ten years' imprisonment and payment of a $30,-000.00 fine. Donald Bruce Holman and Johnny Obert each were sentenced to serve a prison term of six years and to pay a penalty of $30,000.00.

## II. THE IM–MORAL OF OUR STORY: THE FAMILY THAT PREYS TOGETHER DOESN'T ALWAYS STAY TOGETHER

### A. *Voir Dire*

The appellants attack the voir dire of prospective jurors at their trial as unduly perfunctory. They contend that the court failed to conduct a probe sufficient to assure the discovery of potential prejudice and reasonable cause for challenge, as well as to protect against bias stemming from pre- and mid-trial publicity.

■■■ Entrusted to the broad discretion of the trial judge, conduct of the voir dire is reversible only for abuse in the exercise thereof. *United States v. McDowell*, 539 F.2d 435, 437 (5th Cir. 1976); *United States v. Salazar*, 480 F.2d 144 (5th Cir. 1973). Where "the procedure used for testing impartiality created a reasonable assurance that prejudice would be discovered if present," *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976), no abuse of discretion may be found.

At the outset of voir dire, the judge announced: "I intend to get it done before twelve o'clock today." R. Vol. V at 4. The defendants expressly decline to label the judge's completion of voir dire within a prearranged time of an hour and a half as reversible error per se; nevertheless, they contend that coupled with his failure to capitulate to defense requests for further inquiry of individual jurors, his conduct resulted inevitably in prejudicial abuse.

■■■ While the practice of adhering to a pre-scheduled voir dire time frame certainly merits no commendation, we decline to hold as a matter of law that it consti-

tutes abuse of discretion. We note that Rule 24(a) of the Federal Rules of Criminal Procedure commits the direction and scope of inquiry of prospective jurors to the trial judge.[1] Although permitted to ask questions submitted by counsel, he need not do so.[2] Thus, unless the appellants meet their burden of demonstrating prejudice ensuing from the interrogation of the venire, their challenge must be rejected.

By 10:24 a. m., a panel of prospective jurors entered the courtroom. At the outset, fourteen were called into the jury box, introduced to the parties and queried by the court. Following counsel's exercise of challenges to the first panel, a new group was called. After further challenges were made, six additional jurors took seats in the box. The process was repeated until, after an examination of three sets of panels, a complete petit jury was finally selected.

■ Counsel for the appellants now complain of the court's failure to probe more deeply into the particulars of jurors' relationships with law enforcement personnel. The appellants contend that had members of the venire been questioned individually rather than as a whole, information indicative of potential bias supporting additional challenges for cause would more readily have come to light. They point specifically to the failure of one prospective juror to reveal, in response to the court's general inquiry as to law enforcement affiliation, that he worked as a prison guard. Although pressed by counsel to follow up his general query by interrogating the juror individually, the judge declined to do so. The appellants contend that, were the court to have acquiesced and the pertinent information to have been made known on further inquiry, the juror might have been challenged for cause. As it was, they were required to use a peremptory challenge to unseat him. The transcript reflects, however, that in requesting additional individual inquiry, counsel for the appellants neglected to apprise the judge of the juror's vocation, although it was well known to them from information in the questionnaire filled out by jurors prior to the voir dire examination. Having failed to inform the court of the juror's affiliation, they deprived the judge of any valid reason to question him further. We find meritless, therefore, the appellants' present complaint, based as it is on a skewed and misleading assessment of the trial judge's conduct.

■ The questionnaire answered by prospective jurors supplied the appellants with substantial background information regarding each one's family and work. The judge took care to query individually those venirepersons who failed to fill out the questionnaire. Every member of the venire who responded in the affirmative to the judge's question of whether any of them had law enforcement ties was then asked if he or she could set aside those ties and render a fair and impartial verdict. We find that such inquiry sufficed to protect the appellants' rights. Prior consideration by this and other circuits of closely analogous voir dire examinations supports our conclusion:

In *United States v. Mitchell*, 556 F.2d 371 (5th Cir. 1977), the defendant claimed error in the trial judge's failure to excuse upon challenge for cause a retired police officer acquainted with a policeman who was to testify at trial. The challenge was rejected because of the juror's statement that he could serve with impartiality. In upholding the trial court's determination, the Fifth Circuit noted the following:

> the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper.

---

1. Rule 24 of the Federal Rules of Criminal Procedure provides in pertinent part:

 (a) *Examination.* The court may permit the defendant or his attorney and the attorney for the government to conduct the examination. In the latter event the court shall permit the defendant or his attorney and the attorney for the government to supplement

2. *Id.*

While it would have been the better practice to have excused juror Ray under the circumstances, we are unable to hold that the failure to do so was such an abuse of discretion as to warrant the reversal of Mitchell's conviction. Neither personal knowledge by Ray of appellant's case nor any prejudice by Ray was disclosed. Ray was not at the time of the trial a member of the police department. In any event, "the mere fact of membership on a police force is not presumptively a disqualification for service on a jury in a criminal trial." *Mikus v. United States*, 433 F.2d 719, 724 (2d Cir. 1970). If there was any other basis for probing into Ray's objectivity, counsel did not seek to pursue it. To reverse a trial judge on these facts would severely limit the broad discretion that traditionally is accorded a district judge in this area. *United States v. Grant*, 494 F.2d 120, 123 (2d Cir. 1974), cert. denied, 419 U.S. 849, 95 S.Ct. 87, 42 L.Ed.2d 79.

*Id.* at 379.

Similarly, in *United States v. Grismore*, 546 F.2d 844 (10th Cir. 1976), the court upheld the rejection of a challenge for cause of a prospective juror, although she had informed the court that she was married to a policeman and knew many other police officers. The Tenth Circuit found her response at voir dire, indicating that she could set aside her personal ties and serve with impartiality, fully adequate.

A related issue was resolved in like fashion in *United States v. Delval*, 600 F.2d 1098 (5th Cir. 1979), when the court held that mere presence on the venire of a former informant for the Drug Enforcement Administration did not invalidate the entire panel. No abuse of discretion occurred when the trial judge failed to question jurors individually regarding possible conversations they may have had with the agent:

Given the highly attentuated risk of prejudice in this case and absent any specific allegations of improper communication between Markland [the DEA agent] and the other veniremen, the adoption of a rule requiring the quashing of the venire would represent a result wholly incommensurate with the danger to be avoided. The spectre of bias or prejudice must become considerably more tangible before it can overcome the general presumption in favor of jury impartiality. See, e.g., *Murphy v. Florida*, 421 U.S. 794, 799–800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975); *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961); *United States v. White*, 5 Cir., 1975, 524 F.2d 1249 cert. denied, 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976); *United States v. Wayman*, 5 Cir., 510 F.2d 1020 cert. denied, 423 U.S. 846, 96 S.Ct. 84, 46 L.Ed.2d 67 (1975).

*Id.* at 1102.

■ Based on the rationales expressed in the above cases and the lack of any indicia of prejudice resulting from the limitations imposed upon the voir dire, we reject the appellants' attack. Finding no abuse in the trial judge's examination of potential juror prejudice stemming from relationships involving family, friends or work, we turn next to the second aspect of the appellants' objection: conduct of the voir dire with regard to the effects of pre- and mid-trial publicity.[3]

The appellants were tried in their hometown. At the time of their arrest, a full fifty-four days before the trial, three newspaper articles appeared. One detailed the existence of unrelated charges for aggravated battery pending against Donald Bruce Holman; it included a description of the incident, in which Donald Bruce allegedly had knifed one man and stabbed another

**3.** We accept, and the appellants do not dispute, the validity of the Fifth Circuit's recognition in *United States v. Gerald*, 624 F.2d 1291 (5th Cir. 1980) that "[P]retrial and trial publicity do not involve identical circumstances and considera- tions, but the court's responsibility to determine impartiality of jurors is the same for both situations. *United States v. Davis, supra* 583 F.2d [190] at 197 n. 10." 624 F.2d at 1297 n. 2.

several times in a brawl in Pensacola. The remaining two articles were factual and straightforward. Between the 7th and 11th of October, 1980, five more articles were printed regarding a different drug case. The initial three stories mentioned testimony by a witness as to the involvement of Deral Holman in the other case, as well as his arrest, together with his three sons, in the case at bar. The articles failed to specify whether, in naming Deral Holman, reference was being made to Deral Gene or Deral Keith Holman. The last article discussed the other pending trial but did not mention the appellants or the facts of their case. Each article noted that the witness who had implicated Holman had himself participated in the crime and was receiving immunity for his testimony. The article published October 10, 1980, referred both to the witness's damaging admission that he had lied to police and to specific allegations by defense counsel as to further untruthfulness by the witness regarding details of the crime.

During the trial, two more articles appeared, neither of which referred to the appellants or to any particulars of their case. Headlined "Jury Convicts Seven Marijuana Smugglers" and "Smugglers' Bullet Ridden Car Found," each dealt with completely unrelated narcotics cases.

At the voir dire, the judge asked each group of jurors whether any of them had been exposed to publicity regarding the case. Only three revealed such exposure, one of whom was excused for cause on different grounds. The remaining two each stated unequivocally that he or she had formed no binding opinions and could serve impartially. Repeatedly instructed on the subject by the judge, each group re-heard the same questions regarding publicity as they were put to a new set of jurors.

The appellants claim that the judge erred in neglecting both to question each juror who had knowledge of the case regarding the substance of his or her reading and to make an independent evaluation of whether the juror was rendered biased thereby. The same objection was raised by the appellant in *United States v. Gerald*, 624 F.2d 1291 (5th Cir. 1980), where defense counsel's request for further interrogation of venirepersons who indicated prior knowledge of the case was denied. As in the case at bar, the trial court in *Gerald* put a general question to the venire as a whole, asking whether any who had such prior exposure to the facts had formulated conclusions which evidence adduced at trial could not change. Although fifteen of twenty-eight venirepersons had been exposed to media coverage of the case, not one responded positively to the above inquiry of the court. On that basis, defense counsel were not permitted to dismiss such jurors for cause, but peremptorily only.

The Fifth Circuit found no error in the judge's action, noting the teaching of *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751, 756 (1961), that a juror need not be in total ignorance of a case, but rather must be able to "lay aside his impression or opinion and render a verdict on evidence presented in court." 366 U.S. at 723, 81 S.Ct. at 1643. The court recognized, as well, that pursuant to F.R.Cr.P. 24(a), a trial court's discretion consists not merely in questioning prospective jurors regarding possible bias but also in deciding whether such interrogation should be on an individual or collective basis. Although individual inquiry is the preferred practice, collective interrogation does not constitute abuse unless the nature of the publicity "raises a significant possibility of prejudice." *Id.* at 1297, *citing United States v. Davis*, 583 F.2d at 196 (5th Cir. 1980). The mere fact that sporadic media coverage existed in *Gerald* did not support the necessity for additional, individual questioning:

> The time consuming, probing, preferably individual voir dire described in *Davis* generally is not required in cases involving unsupported general allegations of prejudicial pretrial publicity or in cases where the publicity does not create a

significant potential of prejudice. Accord, *Salemme v. Ristaino,* 587 F.2d 81, 88 (1st Cir. 1978); *United States v. Pomponio,* supra, 563 F.2d [659] at 665; *United States v. Johnson,* 584 F.2d 148, 156 (6th Cir. 1978), cert. denied, 440 U.S. 918, 99 S.Ct. 1240, 59 L.Ed.2d 469 (holding that in the absence of a "clear foundation for inquiry into juror recollection of particular prejudicial matter" the trial judge correctly refused to ask questions concerning content of articles jurors may have read); *United States v. Giese,* 597 F.2d 1170, 1183 (9th Cir. 1979), cert. denied, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (holding that in cases where pretrial publicity is not great a defendant's right to an impartial jury is adequately preserved by general questions addressed to the entire venire followed by individual questioning of jurors who respond affirmatively); *United States v. Evan,* 542 F.2d 805, 812–13 (10th Cir. 1976), cert. denied, 429 U.S. 1101, 97 S.Ct. 1124, 51 L.Ed.2d 550 (holding that a trial court does not abuse its discretion by failing to conduct an individual voir dire and refusing to ask questions propounded by the defense if no specific incident of prejudicial publicity is cited).

*Id.* at 1298.

The publicity in the instant case resembles that in *United States v. Hyde,* 448 F.2d 815 (5th Cir. 1971), *cert. denied,* 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972), where jurors were exposed mid-trial to publicity concerning the ongoing case. In view of the innocuous factual nature of the printed material and the fact that much of it consisted of information which would have been admissible at trial, the publicity was held non-prejudicial. Thus, although disapproving the trial judge's questions which allowed the jurors to decide for themselves the effects of the publicity upon them, the Fifth Circuit found no abuse of

discretion. The interrogation of the venire by the judge in the case at bar was neither more cursory nor less efficacious than that of the trial court in *Hyde.* While certainly less than ideal, the trial court's procedure in no way constituted an abuse of discretion. No significant possibility of prejudice was raised by the publication of an article printed nearly two months prior to trial describing Donald Bruce Holman's involvement in an entirely unrelated incident or by simple factual accounts of the ongoing investigation and prosecution, containing data admissible at trial. Furthermore, during both the voir dire and trial, the court instructed the jury on at least ten occasions to adhere to their solemn duty to decide the case solely upon the evidence and to refrain from reading or listening to any news reports concerning narcotics cases.

For the reasons expressed above, we uphold the voir dire examination of the jury, exercised within the sound discretion of the trial judge.

### B. *Similar Act Evidence*

■ The appellants argue that the admission of evidence of prior similar acts on their part was erroneous. At trial, evidence was introduced regarding three previous attempts to smuggle marijuana aboard the Red Fin II and the Lady O, another boat owned by Deral Gene Holman. Deral Keith testified to his father's prior, knowing consent to each venture and to the presence of Johnny Obert and Donald Bruce as crew members in the last two attempts.

Rule 404(b) of the Federal Rules of Evidence precludes the admission of evidence demonstrating a defendant's similar bad acts for the purpose of proving his character. Such evidence is admissible, however, to demonstrate, *inter alia,* a party's motive or intent.[4] Deral Gene contended at trial that he had permitted his son to use the

---

**4.** Pursuant to Rule 404(b) of the Federal Rules of Evidence:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a

person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation,

Red Fin II to transport marijuana solely because of threats on his son's life. Donald Bruce and Johnny Obert accused Deral Keith of fabricating their involvement. The Government's articulated purpose in introducing the evidence of past smuggling activities was to prove the appellants' prior knowledge of the illicit scheme and their willingness to participate in it. The court accepted the prosecution's proffer as properly admissible to prove intent. Because Deral Gene placed his intent at issue in offering a defense of no-consent, and because the remaining appellants refused to stipulate that their intent was *not* at issue, the court found the evidence to be relevant. The appellants now dispute his finding, claiming additionally that the evidence was prejudicial.

We analyze their challenge in light of the standard governing the admissibility of extrinsic offenses. In *United States v. Beechum,* 582 F.2d 898 (5th Cir. 1978) (rehearing en banc), the Fifth Circuit set forth the following two-pronged test:

First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of rule 403. See Rule 404(b) Other Crimes Evidence: The Need for a Two-Step Analysis, 71 Nw.U.L.Rev. 636 (1976).

*Id.* at 911.

Deral Gene's insistence that his consent was involuntary places at issue his knowledge and intent with regard to the offenses charged. Therefore, the evidence of prior bad acts sought to be introduced by the prosecution was clearly relevant to a matter other than Deral Gene's character.

The appellants, Donald Bruce and Johnny Obert, argue that their defense, consisting of unequivocal denials of participation in the crime, rendered their intent completely

irrelevant. They point, as well, to representations which they made to the trial judge, indicating that they would not elicit any evidence regarding intent. Although exhorted on numerous occasions by the prosecution to make good that representation by formally stipulating to the elimination of intent as an issue at trial, the appellants consistently refused to do so.

The appellant in *United States v. Roberts,* 619 F.2d 379 (5th Cir. 1980), who was charged with gambling violations, sought at trial to exclude evidence of his prior gambling conviction unless and until the issue of his intent was raised as a defense. The court ruled that the defendant's plea of not guilty by itself placed intent at issue:

In every conspiracy case ... a not guilty plea renders the defendant's intent a material issue and imposes a difficult burden on the government. Evidence of such extrinsic offenses as may be probative of a defendant's state of mind is admissible unless he "affirmatively take[s] the issue of intent out of the case." *United States v. Williams,* 577 F.2d 188 (2d Cir.), cert. denied, 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978).

*Id.* at 383.

The instant appellants did not affirmatively take the issue of intent out of the case. Rather, like the defense counsel in *Roberts,* they indicated only that they would not actively dispute its existence. As the court noted in *Roberts,* however, such assurances simply do not suffice:

Robert's defense counsel did not, however affirmatively remove the issue of intent from the case when he raised his motion to exclude the extrinsic offense evidence. He indicated only that he would not actively contest the issue. That alone did not reduce the burden on the prosecution to establish intent, as an element of the offense, beyond reasonable doubt.

*Id.* at 383.

Having established the first element of the *Beechum* test, the relevancy of the prior

plan, knowledge, identity, or the absence of mistake or accident.

similar acts evidence, we now examine whether the second prong was fulfilled, that is, whether the probative value of the evidence was outweighed by its potentially prejudicial effect. FRE 403.[5] *Beechum* provides instructive guidelines for this balancing process:

> In measuring the probative value of the evidence, the judge should consider the overall similarity of the extrinsic and charged offenses. If they are dissimilar except for the common element of intent, the extrinsic offense may have little probative value to counterbalance the inherent prejudice of this type of evidence. Of course, equivalence of the elements of the charged and extrinsic offenses is not required. But the probative value of the extrinsic offense correlates positively with its likeness to the offense charged. Whether the extrinsic offense is sufficiently similar in its physical elements so that its probative value is not substantially outweighed by its undue prejudice is a matter within the sound discretion of the trial judge. The judge should also consider how much time separates the extrinsic and charged offenses: temporal remoteness depreciates the probity of the extrinsic offense. E.g., *United States v. Carter*, 516 F.2d 431, 434–35 (5th Cir. 1975).

582 F.2d at 915.

The evidence admitted in the case at bar was of conduct nearly identical to the offenses charged at trial. The occurrence of the three prior smuggling incidents during the first part of 1979 was extremely close in time to the July '79 episode for which the appellants were tried. These factors militate in favor of a finding that the probative value of the evidence of prior similar acts exceeded its prejudicial effect. We therefore conclude that the trial judge's admis-

sion of the evidence of prior bad acts on the basis of its relevancy and probative value was well within his broad discretion.

### C. 404(b) Evidence

The appellants next argue that the trial court unduly limited their cross-examination of Deral Keith Holman and improperly excluded direct evidence of his motive to lie.

The appellants sought to introduce evidence of the following event, which occurred shortly before Deral Keith's arrest. A freighter carrying marijuana approached the fishing vessel, "Malcolm B," on which Deral Keith was serving as a crew member. Deral Keith unsuccessfully attempted to persuade the Captain of the Malcolm B to dump the fish carried on his boat and to take on the marijuana in its place. The court excluded the proffer of the Captain's testimony and cross-examination on the matter as bad character evidence irrelevant to the issues at trial.

■ At the outset, we note that the exclusion of questions regarding collateral crimes impinging solely on a witness's credibility and bearing no relation to the subject matter of his or her direct examination is subject to the sound discretion of the trial judge. *United States v. Cardillo*, 316 F.2d 606, 611 (2d Cir. 1963).

Deral Gene argues, however, that contrary to the trial court's ruling, the evidence was relevant to his coercion defense, since it tended to establish a habit on the part of his son to force people to smuggle drugs.

Pursuant to FRE 406, evidence of an individual's habit is admissible to prove that he or she acted in accordance with it on the occasion in question.[6] In contrast to character evidence, which has been defined as

---

**5.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
FRE 403, 28 U.S.C.A.

**6.** Rule 406 provides as follows:

"a generalized description of one's disposition, or one's disposition in respect to a general trait, such as honesty, temperance or peacefulness," *McCormick on Evidence* § 195 at 462–63 (2d ed. 1972), habit denotes conduct of a much more specific variety:

> [Habit] describes one's regular response to a repeated specific situation ... A habit ... is the person's regular practice of meeting a particular kind of situation with a specific type of conduct, such as the habit of going down a particular stairway two stairs at a time, or of giving the hand-signal for a left turn, or of alighting from railway cars while they are moving. The doing of the habitual acts may become semi-automatic.

*Id.*

Our determination of whether the Malcolm B incident sought to be introduced by the defendants represents evidence admissible to prove a habit or excludable as probative of character, is informed by the insight of the Fifth Circuit in *Reyes v. Missouri Railroad Co.*, 589 F.2d 791 (5th Cir. 1979):

> Although a precise formula cannot be proposed for determining when the behavior may become so consistent as to rise to the level of habit, "adequacy of sampling and uniformity of response" are controlling considerations. Notes of Advisory Committee on Proposed Rules, Fed.R.Evid. 406, 28 U.S.C.A. at p. 153.

*Id.* at 794.

The court in *Reyes* held that four prior convictions for public intoxication during a three and a half year period were of "insufficient regularity," *id.* at 795, to constitute evidence of a habit. Likewise, we cannot accept Deral Gene's contention that, had it been introduced, the Malcolm B incident would have transformed Deral Keith's purported use of coercive tactics vis-a-vis drug transactions in isolated instances into a stimulus-response habit. Of "insufficient regularity" to be deemed a habit, the incident could have proved nothing more than a character trait to which Deral Keith adhered. As such, it was patently inadmissible. FRE 404(a).

Donald Bruce and Johnny Obert argue for the existence of yet another permissible purpose supporting introduction of the evidence, that of Deral Keith's bias and motive to lie. In so doing, they rely on FRE 404(b), which allows for introduction of extrinsic offense evidence to prove "motive, preparation, opportunity, intent, plan, knowledge, identity, or absence of mistake or accident," and on FRE 405(b), which states as follows:

> In cases in which character or trait of character of a person is an essential element of a charge, claim or defense, proof may also be made of specific instances of his conduct.

At trial, the appellants were permitted unrestricted impeachment of Deral Keith concerning any bias resulting from his fear of prosecution. As the government now points out, never during trial did the appellants suggest that the Malcolm B evidence was being offered to show such bias on the part of Deral Keith. Even assuming *arguendo* the validity of admission for that purpose, it was within the scope of the trial judge's sound discretion to have determined that the probative value of the evidence was far outweighed by its prejudicial effect and that its cumulative effect rendered its introduction needlessly wasteful. FRE 403.

### D. Polygraph Statement

During a particularly probing point in cross-examination, when Deral Keith Holman was being questioned as to his veracity, the witness revealed that he had taken a polygraph examination.[7] Counsel for the appellant reacted to his unexpected re-

---

Evidence of the habit of a person ... is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit ...

**7.** During the course of Deral Keith's cross-examination, the following colloquy took place:

sponse by moving for a mistrial. The judge denied the motion, but gave the jury immediate and specific instructions to disregard the witness's comment:

> Ladies and Gentlemen of the Jury, you will disregard the witness's last answer concerning the polygraph test. That's completely irrelevant to this witness's testimony and will not be considered by you in any way in arriving at your verdict.

R. Vol. VIII at 108.

The Fifth Circuit clearly prohibits admission at trial of the results of a polygraph examination. *United States v. Clark*, 598 F.2d 994 (5th Cir. 1979). On that basis, the appellants argue that Deral Keith's statement before the jury requires reversal. Although the results of the test were not mentioned, the appellants argue that the witness's reference contained an implication that his testimony had been verified by the exam.

■ The general rule is that evidence withdrawn from the jury with directions to disregard may not constitute reversible error unless it is so prejudicial as to be incurable. *United States v. Klein*, 546 F.2d 1259, 1263 (5th Cir. 1977); *United States v. Smith*, 517 F.2d 710, 711 (5th Cir. 1975). Consequently, the appellants' objection hinges on whether the above instructions given by the judge sufficed to remedy the effect of the statement.

In *United States v. Martino*, 648 F.2d 367 (5th Cir. 1981), two references to polygraph examinations were made during trial. In one instance, the key government witness testified impermissibly of his willingness to take a lie detector test; at another point, a different prosecution witness indicated that pending charges against him could be defeated if he were to take a polygraph exam. In holding both these references non-prejudicial, the Fifth Circuit relied on the curative effect of the trial judge's instructions to the jury to disregard the comments, followed by his explanation of the unreliability of polygraph results.

Similarly, in *United States v. Smith*, 565 F.2d 295 (4th Cir. 1977), the government improperly questioned a witness regarding his having taken a lie detector test. The Fourth Circuit deemed the error to have been fully cured by the judge's immediate striking of the evidence and cautionary instruction to the jury directing them to disregard the impermissible question and response.

■ In like fashion, the trial judge in the instant case remedied the error by immediately cautioning the jury to disregard Deral Keith's retort and by reminding them once again at the close of trial of their responsibility to render verdicts solely on the basis of properly admitted testimony. Given this record, we, as the Fifth Circuit in *Martino* and the Fourth Circuit in *Smith*, "cannot conclude . . . . that what the judge did was ineffective or that he should have done more." 565 F.2d at 295.

### E. Cross-Examination

The appellants contest the trial court's restriction on cross-examination and introduction of extrinsic evidence regarding Deral Keith Holman's use of drugs. During

> Q Now, Deral Keith, who is going to determine whether you testified fully and truthfully.
> A The jury.
> Q As far as your plea bargaining agreement, the jury is going to decide?
> A I'm not sure about that.
> Q Well, who do you think is going to decide? Let me ask it this way, Deral Keith, when this trial is over, you are going to sit down with the prosecutors, aren't you, and are going to determine whether and discuss whether you testified "fully and truthfully", that not true?
> A True.
> Q You know that?
> A Well, I have already tooken a polygraph test.

R. Vol. VIII at 106–07.

the *James* hearing,[8] the appellants questioned Deral Keith in detail regarding his current and past drug use. He was asked to specify the last times he had used controlled substances; their effect, if any, upon his memory; and whether at present he was under the influence of any drugs.

At the trial proper, the appellants sought to supplement direct testimony elicited by the prosecution regarding Deral Keith's prior drug record at the time he was arrested with evidence on cross-examination demonstrating his drug use at other, unspecified dates. The court restricted cross-examination to his use of controlled substances during the relevant times of July 17, 1979, the date of the marijuana smuggling transaction; September 4, 1979, the date of his arrest; and the period of trial. The judge ruled that evidence of drug use on the part of Deral Keith at any other times constituted a collateral matter not provable by extrinsic evidence.

■ As evidence of character, the appellants' proffer of drug use aside from these relevant times is clearly impermissible under the mandate of Rule 404(a). The only other possible basis for admission derives from FRE 404(a), which permits the introduction of extrinsic evidence regarding collateral instances of specific conduct for impeachment purposes only.[9] However, even when offered for the permissible objective of disputing credibility, such evidence may still be excluded. Because extrinsic evidence of a witness's character "tends to confuse the issues and promote unfair surprise and multifariousness," *United States v. Banks*, 475 F.2d 1367 (5th Cir. 1973), it is left to the sound discretion of the trial court to determine admissibility in each case. *United States v. Dinitz*, 538 F.2d 1214 (5th Cir. 1976). The exercise of that discretion consists in balancing the significance of the proffered evidence against the likely prejudice, confusion or waste of judicial resources which might ensue from its introduction. FRE 403; 611(a).[10] The tenuous value of the proffered impeachment evidence vis-a-vis its prejudicial effect persuaded the Fifth Circuit in *United States v. Banks, supra,* to reject a co-defendant's offer of testimony specifying drug sales by a confidential government informant in order to impeach the latter's veracity. Reviewing the trial court's refusal to admit evidence regarding a witness's past drug addiction prior to trial, the court in *United States v. Kizer*, 569 F.2d 504, 506 (9th Cir. 1978), found no abuse warranting reversal. Limitation of specific instances of drug use to relevant periods of trial and the transaction charged in the indictment, constituted a proper exercise of judicial discretion.

■ The instant appellants would have this court find, on facts remarkably similar to those in *Kizer*, that the trial judge's discretion was abused. To support this

---

8. In order to determine the admissibility of co-conspirator statements by Deral Keith Holman, a *James* hearing was held outside the presence of the jury to ascertain, by independent evidence,

(1) that a conspiracy existed, (2) that the coconspirator and the defendant against whom the coconspirator's statement is offered were members of the conspiracy, and (3) that the statement was made during the course and in furtherance of the conspiracy. *United States v. James,* 590 F.2d 575, 582 (5th Cir. 1979).

9. According to FRE 608(a),

The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limita-

tions: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

10. *(a) Control by court.* The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment and undue embarrassment.

FRE 611(a), 28 U.S.C.A.

view, they turned to the ruling of the Fifth Circuit in *Jackson v. United States*, 311 F.2d 686 (5th Cir. 1963). The district court in *Jackson* was found to have acted properly in allowing cross-examination regarding the defendant's out-of-court statements conceding current drug use, where the defendant's assertion to the contrary was not *collateral*, but rather formed the crux of his defense. Similarly, in *United States v. Gonzalez*, 491 F.2d 1202 (5th Cir. 1974), the defendant's denial of drug dealing was central to his defense, thereby rendering specific, contradictory extrinsic evidence properly admissible. Given the collateral nature of the evidence sought to be introduced by the present appellants, however, their reliance on *Jackson* and *Gonzalez* is singularly misplaced.

We conclude that the appellants have demonstrated no abuse of discretion by the trial judge, who determined that the proffered evidence of collateral instances of prior drug use was irrelevant and, hence, inadmissible.

### F. Taped Instructions

█ The appellants charge error in the court's sending of a tape recording of his instructions to the jury room. Submission of written instructions is within the sound discretion of the court. *Stephens v. United States*, 347 F.2d 722, 725 (5th Cir.) *cert. denied*, 382 U.S. 932, 86 S.Ct. 324, 15 L.Ed.2d 343 (1965); *United States v. Hill*, 589 F.2d 1344, 1352 (8th Cir. 1974); *United States v. Silvern*, 484 F.2d 879 (7th Cir. 1973). The recent holding of the Fifth Circuit in *United States v. Watson*, 669 F.2d 1374, (5th Cir. 1982), affirmed the extension of this practice to tape recorded versions of jury instructions. It carefully distinguished the prior case of *United States v. Schilleci*, 545 F.2d 519 (5th Cir. 1977), in which submission of written instructions constituted reversible error because of the court's overemphasis of isolated parts of the charges. By contrast, the trial judge in *Watson* clearly and specifically instructed the jury to follow all the instructions as a whole.

Unlike *Schilleci*, this jury was adequately informed that the whole charge must be considered in reaching their verdict. Against that background, the judge's further instruction regarding use of the tape recorder was not prejudicial.

*Id.,* at 1386.

The holding and reasoning of *Watson* apply with equal force to the case at bar, where the district court carefully and repeatedly instructed the jury to consider all the instructions as a whole, giving no particular emphasis to any one portion. Having shown no prejudice ensuing from implementation of this practice, we reject the appellants' challenge as meritless.

### G. Allen Instruction

█ At 12:18 p. m. on Tuesday, October 21st, 1980, the fourth day of the trial, the jury retired to deliberate. A little more than five hours later, the foreperson sent the following message to the judge:

> Judge, at this time this jury is hung on this case due to the lack of more evidence.

R. Vol. II at 456.

After recalling the jury to the courtroom, the court proceeded to give them a modified *Allen* charge, as set forth in Trial Instruction No. 6, Pattern Jury Instructions of the United States District Judges Association (Criminal Cases) (1979). The jury resumed deliberations forthwith and returned, over two hours later, with verdicts of guilty as to each defendant on both counts of the indictment.

The Fifth Circuit has on numerous occasions upheld the giving of a modified *Allen* charge after jury deliberations lasting less than five hours, the duration in the instant case. *See e.g., United States v. Thomas*, 567 F.2d 638 (5th Cir. 1978); *United States v. Atkins*, 528 F.2d 1352 (5th Cir. 1976); *United States v. Betancourt*, 427 F.2d 851 (5th Cir. 1970); *Andrews v. United States*, 309 F.2d 127 (5th Cir. 1962), all of which upheld the giving of the charge after deliberations lasting two hours and less.

The appellants' argument that the court should have given further instructions on reasonable doubt is without substantiation. Instructions which were given the jury accurately allocated to the government the burden of proving the defendants' guilt beyond a reasonable doubt and properly emphasized that the jurors should consider the instructions as a totality. The court's direction that no juror should yield a conscientious conviction and his suggestion that each consider and re-consider his or her determination, be it to acquit or to convict, belie the appellants' present complaint.

In *United States v. Bailey*, 468 F.2d 652, 662–3 (5th Cir. 1972), instructions that the jurors should neither yield to a verdict nor violate their individual consciences precluded a finding of prejudice in the trial court's failure to reinstruct on the burden of proof. Here, the district judge provided the jury with just such an admonition. We therefore uphold the trial judge's modified *Allen* charge as proper.

## G. *Grand Jury Foreperson*

Lastly, the appellants seek reversal because of alleged discrimination in selection of the grand jury foreperson. During the relevant period of 1969 to 1979, only one black female was appointed to that position in the Northern District of Florida. After a hearing on the matter, Circuit Judge Hatchett, sitting by designation, denied the appellants' motion to dismiss their indictment on the basis of purported discrimination in the selection process. Finding that a prima facie case of discrimination had been established, Judge Hatchett nevertheless concluded that the government had met its burden of rebutting the appellants' case. 510 F.Supp. 1175. We begin our review of Judge Hatchett's ruling with an examination of the prior issue of justiciability: that is, whether these appellants, who are caucasian males, possess standing to contest the exclusion of blacks and women as grand jury forepersons.

■ In *United States v. Perez-Hernandez*, 672 F.2d 1380 (11th Cir. 1982), a panel

of this Court afforded standing to a defendant who was not a member of the excluded class for the purpose of contesting discriminatory selection of the grand jury foreperson. The panel reached that conclusion despite its acknowledgment of prevailing Supreme Court precedent which would appear to deny standing to such a defendant:

> Appellant is a male of hispanic descent who claims a denial of equal protection because blacks and women have been excluded from serving as grand jury foremen. Conflicting language in several recent Supreme Court cases has clouded his right to assert this claim. In *Peters v. Kiff*, 407 U.S. [493] at 498, 92 S.Ct. [2163] at 2166, [32 L.Ed.2d 83] the opinion of the Court discussed this question in an equal protection context and concluded that "when a grand or petit jury has been selected on an impermissible basis, the existence of a constitutional violation does not depend on the circumstances of the person making the claim." Three years later, the Court reaffirmed this holding, although in the context of a Sixth Amendment claim. *Taylor v. Louisiana*, 419 U.S. [522] at 526, 95 S.Ct. [692] at 695 [42 L.Ed.2d 690]. In 1977, however, the Court used significantly different language to address the same question: "Thus, in order to show that an equal protection violation has occurred in the context of grand jury selections, the defendant must show that the procedure employed resulted in substantial underrepresentation of *his race* or of the identifiable *group to which he belongs*." *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977) (emphasis added). In *Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), the opinion of the Court at first seems to support the holding in *Peters v. Kiff*: "[T]he Court has recognized that a criminal defendant's right to equal protection of the laws has been denied when he is indicted by a grand jury from which members of a racial group purposefully have been excluded." *Rose v. Mitchell*, 443 U.S. at 556, 99 S.Ct. at 3000. Later

in the opinion, however, the troublesome language from *Castaneda v. Partida* is quoted with approval. *Id.* at 565, 99 S.Ct. at 3005. Despite this apparent conflict, we conclude the appellant is not precluded from bringing this claim even though he is not black or female.

*Id.*, at 1385.

The court explained its conclusion by asserting, in the face of the Supreme Court's unambiguous language in *Castenada v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977), that the holding in *Peters v. Kiff*, 407 U.S. 493, 498, 92 S.Ct. 2163, 2166, 33 L.Ed.2d 83 (1972), has never been "expressly overruled." *Perez-Hernandez*, at 1385. *Cf., e.g., United States v. Cross*, 516 F.Supp. 700 (M.D.Ga.1981); *United States v. Layton*, 519 F.Supp. 946 (N.D. Cal.1981). In accord with our existing precedent, we find standing on the part of the instant appellants.[11]

■ The appellants' claim is brought under the fifth and sixth amendments, alleging violation, respectively, of appellants' rights to equal protection of the laws and representation of a fair cross-section of the community.[12] The former amendment has been invoked to forbid intentional exclusion of members of identifiable groups as grand jury forepersons. *Rose v. Mitchell*, 443 U.S. 545, 556, 99 S.Ct. 2993, 3000, 61 L.Ed.2d 739 (1979). The latter has been relied on to prohibit discrimination, whether intentional or not, in the overall grand jury selection process. *Alexander v. Louisiana*, 405 U.S. 625, 630–32, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972); *Turner v. Fouche*, 396 U.S. 346, 361, 90 S.Ct. 532, 540, 24 L.Ed.2d 567 (1970). The Eleventh Circuit in *Perez-Hernandez, supra*, specifically limited the extent of the sixth amendment guarantee to the selection of the entire venire, grand or petit; it held that the right to a fair cross-section of the community is not implicated in the choice of a grand jury foreperson:

> [T]he Sixth Amendment right to an "impartial jury" is given full effect by insur-

---

**11.** Prevailing precedent in this Circuit precludes one panel from overruling the decision of another. Instead, where there is a disagreement as to the state of the law, the proper procedure is for the entire court to hear the question *en banc. See, e.g., McDaniel v. Fulton Nat. Bank of Atlanta*, 543 F.2d 568, 570; *United States v. Lewis*, 475 F.2d 571, 574 (5th Cir. 1973). Our adherence to this practice is mandated by *Bonner v. Prichard*, 661 F.2d 1206 (11th Cir. 1981), in which the Court of Appeals for the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit in effect prior to October 1, 1981.

**12.** While agreeing with the majority as to its conclusions regarding standing, Judge Morgan, in his concurring opinion in *Perez-Hernandez*, took issue with the more fundamental question of whether any constitutional right is even implicated in the selection of the grand jury foreperson. The relative insignificance of the role of the foreperson in the federal grand jury system, as noted by Judge Morgan, provides persuasive support for limiting constitutional challenges to the selection procedure. While restricting our holding here to a review of Judge Hatchett's ruling, which ultimately rejects the appellants' discrimination claim on the merits, we echo Judge Morgan's concern:

> [B]efore a defendant may challenge his indictment because of discrimination in the judicial system, I believe that the discrimina-

tion must be related to a significant position or part in the administration of justice. Thus, discrimination in the selection of grand and petit juries would allow subsequently convicted defendants to appeal their convictions. I do not believe, however, that the position of federal grand jury foreman is significant or even remotely necessary to the proper administration of justice. Federal grand jury foremen perform menial, insignificant tasks. Their position does not give them the ability to independently affect the judicial system or the rights of a defendant; they have no more power than any other member of the grand jury panel. Appellant, of course, argues that the mere title gives a foreman the ability to unfairly persuade and influence the other grand jury members, but I cannot believe that federal grand jury members are innocent and naive lambs and the foreman their shepherd. Accordingly, I believe that discrimination in the selection of federal grand jury foremen, if proven, does not justify the quashing of subsequent indictments. I must wonder how society would view the integrity of our courts if unharmed criminal defendants are released because of discrimination which is unrelated to any significant part of the judicial system. The social costs are not justified in this instance. *United States v. Perez-Hernandez*, at 1389 (Morgan, J., concurring).

ing that distinct groups of the community are represented, but are not given the opportunity to dominate, or, in the alternative, denied the opportunity to participate, in a democratic system of justice. Accordingly, the fair cross section analysis is only applicable to groups, such as a grand or petit jury, which can represent society as a whole. One person alone cannot represent the divergent views, experience, and ideas of the distinct groups which form a community. Thus, a grand jury foreman is a member of the group which represents a cross section of his or her community, but he or she cannot be a fair cross section of that community. Since we are not presented with a fair cross section challenge to the *entire venire* of the grand jury below, we must affirm the trial court's ruling on this issue (emphasis added).

*Perez-Hernandez,* at 1385.

Consequently, we reverse that portion of Judge Hatchett's order acknowledging the existence of a sixth amendment fair cross-section right with regard to the selection of a grand jury foreperson. *See also United States v. Jenison,* 485 F.Supp. 655, 665 (S.D. Fla.1979).

■ The court in *Perez-Hernandez* did, however, reaffirm the viability of a fifth amendment right to equal protection in the grand jury foreperson context. To prevail on the grounds of a fifth amendment violation, the claimant must prove a prima facie case, consisting of (1) identification of a cognizable class; (2) significant underrepresentation of that class; and (3) susceptibility to abuse of the selection procecure. Once a prima facie case is established, the government must overcome it by introducing evidence that the discrimination, if any, was unintentional. *Castenada v. Partida, supra* at 494, 97 S.Ct. at 1280.

■ Accepting Judge Hatchett's conclusion that a prima facie case was made out as to the appellants' fifth amendment claim,[13] we affirm his ruling that it was rebutted by the government's proof of a lack of discriminatory intent. Both judges of the Northern District of Florida who testified at the hearing and in deposition asserted that their selections were rendered with no view to the jurors' race or sex; Judge Stafford stated that he was unaware that the jurors' race was even indicated on the questionnaire.

On the basis of the foregoing, the convictions of the appellants are hereby AFFIRMED.

■

---

**13.** During oral argument of the case at bar, it was revealed that selection of the appellants' grand jury constituted Judge Higby's first impanelment. Given the absence of any evidence that he discussed the selection process with any other judge of the Northern District of Florida, a serious question remains as to whether statistics dealing with selections by other judges during the past ten years indeed prove anything at all with regard to the instant appointment by Judge Higby.